At this time, we have Martinez v. Idaho State Corrections Institution, and for appellant, we have Andrew Hormats. We've got this. I should say for appellee, we have Mr. Blount. Ten minutes per side. Thank you. I'd like to respond. Please stop short of fusing it all up if you'd like rebuttal. I will say, just as I told our Spokane lawyers that we appreciated their travel together, we appreciate your travel together, too. Thank you. It's actually nicer here than at home, in bad weather. May it please the Court. Andrew Parnes appearing on behalf of Mr. Martinez in this matter. Your Honor, Your Honor, this case, I think, talks about a problem in our adversary system and what happens when an attorney really abandons his client for a number of reasons at a number of different junctures in the proceedings. And the briefs cover a lot of detail. I'd like to focus on what I consider a couple of instances that are serious instances of abandonment of Mr. Martinez by his court-appointed attorney, Mr. Toothman. Initially, in looking at this, there is really only one substantive communication between Mr. Toothman and Mr. Martinez, and that occurs in December of 1989. And this case goes to trial in June of 1990. And that is a time of a communication before discovery, before the grand jury transcripts are available. After that time, there is really no substantive communication about the case between Mr. Toothman and Mr. Martinez. Was there some communication between Mr. Toothman and Mr. Eastwood and Mr. Eastwood and Mr. Martinez? Mr. Ellsworth? Ellsworth. Yes, there was. And those are two letters in April after what I consider to be one of the instances where there's an abandonment of Mr. Martinez. And those letters are written basically, as Mr. Ellsworth testified, at the direction of Mr. Toothman. And they repeat basically the instruction, we're not going to listen to you, essentially. We're not going to do what you've asked us to do about the case. And Mr. Ellsworth essentially then for the first time has a face-to-face meeting with Mr. Martinez during the trial. Not before the trial, but during the trial. So that his attorney, who does the cross-examination at that point, Mr. Ellsworth, who comes along to assist Mr. Toothman, has not met Mr. Martinez before the middle of trial. At the March hearing on Mr. Martinez's motion to substitute counsel, Mr. Toothman was the only attorney present. No other attorney had been involved up until that time. And at that moment, when he had a duty to his client, he abandoned that duty in a number of ways. First of all, when the prosecutor said, well, if Mr. Martinez, if you want to tell us what's going to happen, you're going to have to waive your attorney-client privilege in order to try and get another attorney. That's not the law in Idaho. It's not the law before federal courts. That hearing should have been held in camera to provide Mr. Martinez an opportunity to tell the court why he needed a different attorney, why the motion for substitution was valid. And yet Mr. Toothman didn't stand up and say, Your Honor, the prosecutor shouldn't be here. This should be held in camera. Instead, he misrepresented to the court what occurred. And he indicated to the court, well, I've investigated these allegations, and there's no substance to them. When, in fact, at the evidentiary hearing, we know now that he didn't investigate that, that he didn't look at the record, that he hadn't talked to anybody, and, in fact, there were significant conflicts, conflicts with prior representation by other attorneys in the public defender's office of the complaining witness and the other prosecution witness. Let's pause on that one for a minute. Whatever else might be a problem, can it really be a problem that other lawyers in the defender's office represented a victim? Yes. It's as if you're in a law firm, and the law firm represented another defendant, had represented prior defendants in a case. They're considered a law office, and there were other people. There's no question that the other witnesses were represented by another attorney in that office. What the State argues, well, you didn't learn any information from them. We didn't learn we didn't have any confidential communications that were found out about. But that's exactly the problem. There was no attempt to find out and present information about these witnesses. And I think that there is at least an implicit finding that the reason for that was that they were represented by these people. And in the other instance, it's the witness. Wait a minute. I'm not following you. If the public defender represented Quillen and Rumpf on other cases, you would expect them to have found out all the dirt about Rumpf and Quillen. Are you saying that there was a failure to communicate that dirt to Toothland? Well. And if so, what was the dirt? Well, basically, what was found out is that Mr. Toothman never told Mr. Martinez that there was any conflict, that there was any representation. My question is, if the Idaho PDs represented Rumpf and Quillen and they were bad actors, and they found out they were bad actors and some good stuff upon which to cross-examine them and impeach them, are you claiming that that information was not given to Toothman so he could use it against Rumpf and Quillen? We don't. So what was that information? Well, we don't. So you're dealing in the abstract and the possible and the speculative. It is that part of it at that time. But at the hearing where the judge, where Martinez makes the motion and brings the motion to the judge in March of 1990, four months before the hearing, Toothman says, I don't know. I've investigated conflicts. But he hadn't. He admits at the evidentiary hearing that he hadn't investigated those. And as a result, the judge never has a full hearing to find out whether this is just a conflict of personality or whether there are substantive conflicts here. He would have found out had there been a hearing about the witness, Mary Poliso, that Mr. Toothman had a personal conflict with, a personal belief that she was mad at him because of the way that this witness had the witness's boyfriend had been represented by Mr. Toothman. And she was mad at him. And he didn't call her as a witness. And that witness ---- I have a question for you on conflicts. And I'm going to rethink this based on what I said earlier, based on your argument. It's been a while since I read memos or wrote them in a law firm about conflicts. But I'm recalling that ethics issues related to substantial similarity or the similarity in the former representation and a new one, yet former client. Now, were the representations of Poliso or of the victim similar in any way to this? Or just that they have their similarity in the sense of the common witness or participant? You know, I'm sort of running out of time. But, yeah, there's no ---- not in terms of the nature of the charges, but certainly they were represented on felony cases where they were accused of crimes. And so the question is, is can you continue to represent without telling the client about it? And I remember Mr. Martinez knew nothing about this, and it was represented to him, really, that there was no even potential conflict. I'm going to let you get back to your argument. We'll add three minutes to your time and we'll give the government a little more if they need it. Okay. And what I would do then, Your Honor, at this point is I'd reserve rebuttal at this time. Thank you. That's fine. We're going to add to the rebuttal time three minutes. So if you need any little time over ten minutes, you go ahead. Thank you, Your Honor. Hopefully I will not. May it please the Court, Martinez's case largely rises and falls on this actual conflict of interest claim. And so I'd like to discuss that first, but I would like to first correct a couple of things that have been stated here. Mr. Toothman testified that he didn't recall what the conflict was. He couldn't recall that. Not that he didn't investigate it. And regarding the poliso dislike of Mr. Toothman, that issue is actually not properly before this Court because it was raised for the first time in post-hearing briefing. It was not an issue upon which an evidentiary hearing was sought in the Federal habeas petition. Furthermore, the State would like to promote the Strickland standard rather than the Kyler v. Sullivan standard here, but understanding that this panel cannot overrule another panel, we rely on footnote four of the Respondent's brief. Regarding the lack of contact, there was very little contact between the December 13th initial communication after the arraignment and the time that Mr. Martinez filed his motion for substitution of counsel. But only a month and a half had elapsed. Mr. Hansen had communicated with the defendant regarding matters because he had appeared he was another PD who had appeared at the change of plea hearing and one other hearing. And there was communication between Hansen and Toothman. Mr. Ellsworth, after the motion for substitution of counsel was brought in, to kind of bridge what Ellsworth saw as a personality gap between or a personality conflict that Martinez had with Mr. Toothman, not a conflict of interest. Mr. Ellsworth is a rather prominent criminal defense attorney in Boise at this time and is, I think, well respected by the judiciary in the State. In order to show an actual conflict of interest or a breakdown of communications or whatever he wanted to assert as the basis for substitution of counsel, even though he did not have the full hearing, because he wouldn't waive his Fifth Amendment privilege or attorney-client privilege in order to allow Mr. Toothman to discuss those things, his opportunity to prove that claim was at the Federal evidentiary hearing under Shell v. Wig. Kennedy. Why didn't the State trial judge allow Mr. Martinez an in-camera session with just Mr. Toothman and Mr. Martinez to explain what Martinez thought was the reason for no conflict, for a conflict without waiving the attorney-client privilege? Isn't that error? Your Honor, that, I wish I knew. But under Shell v. Wittig, which is the authority which we perceive with this sort of claim, the ultimate constitutional question the Federal court has to answer is not whether he should have had that hearing or not. It's whether or not the error actually violated the Federal judgment. The constitutional right, his constitutional rights, in that the conflict between Martinez and his attorney became so great that it resulted in a total lack of communication or other significant impediment that resulted, in turn, in an attorney-client relationship that fell short of what the Sixth Amendment requires. The State would submit that Mr. Martinez has failed to meet that burden. There was no complete breakdown of communications because Mr. Ellsworth was brought in to bridge that gap and did so successfully. There was no Sixth Amendment violation because Mr. Martinez has failed to show that there's anything that should have been communicated about that was not, that if had been presented at trial or sentencing, would have produced or would have, there would be a reasonable probability of a different result of the proceedings. And that's the standard that we look at. And that wasn't done even at the habeas hearing. Pardon me, Your Honor? And that was not done at the habeas hearing. Correct, Your Honor. And that was his opportunity to do so. I mean, that was the opportunity for Martinez to say the reason we had to get rid of Toothman was because he was having a relationship with Rumpf and Quillen and everybody else, right? Your Honor, yeah. Respectfully, there's no evidence to that effect. We can imagine those things. And what's the standard? What do our cases say is the standard for when there's a total breakdown of communication sufficient to be considered a constructive denial of counsel? Your Honor, I believe that that standard is articulated in Bland, which was to a certain extent overruled in Shelby-Wittig. But the Bland talks about just no communication whatsoever and not presenting defenses that were obvious or other kinds of things that would have been obvious. There's nothing here in this case. Mr. Martinez really wanted to engage in a, you know, campaign of character assassination against the victim, Cheryl Rumpf, by presenting information that she was a prostitute, that he had paid her on that night, that she had lots of call-outs from this A1 agent, you know, escort agency. His attorney made a tactical decision that that was not relevant information that that was actually harmful. Beating up on the victim in a case is generally something that, you know, leads to juror sympathy for the victim and juror animus towards the defendant. That was a smart tactical decision in this case. Now, is that one of the subjects of the hearing in district court? Your Honor. In other words, how do we know it was a tactical decision? Did they decide that? Was there evidence on it? Because there was evidence presented by Mr. Toothland that he didn't think it was a good idea. At the district court hearing? Yes, Your Honor. Okay. If I could, before too much time goes, move you just to a Strickland question. Wholly apart from conflicts and everything, why wasn't it ineffective assistance to fail to interview and call Mary Polizzo? Thank you, Your Honor. Mary Polizzo had no personal knowledge of the attack. Her statement that she gave to the police, the information that was provided through discovery to Mr. Toothland. The defense's consent, and she says, well, seven hours after all these horrible things that were done against her will, she and Martinez are sitting on a couch in that trailer and having a normal conversation and so on. Your Honor, she didn't indicate that they were having normal conversation. What she did indicate is that they were there together. That goes to, you know, she had opportunity to escape statement or some such thing. That actually cuts against the defense in this case, which is consent. Why? Because the opportunity to escape indicates that there was something to escape from. Well, that's right. And, therefore, if she had an opportunity and didn't do escape, then there wasn't anything to escape from, and she had consented. It also fails to or that Mr. Martinez is a huge man, a very powerful man. And Ms. Rumpf was a very slight and a slight person who had been intimidated over a considerable period of time by Mr. ---- Did Ms. Rumpf testify? Yes, Your Honor. Didn't she testify that she stayed there for all those hours? Wasn't she cross-examined on that? Yes, Your Honor. She did. So that fact was established without Ms. Poliso. Correct, Your Honor. But the jury gets to decide whether she consented or not. And the jury did decide. Yeah. But do they have all the evidence? So was there evidence in the record that counsel made a strategic decision not to try to call Ms. Poliso because she was known as Scary Mary, you know, or she had drug problems or for whatever reasons? Yes, Your Honor. And what's the evidence in the record on that? In other words, the evidence that would support that there was a decision not to proceed with her as opposed to carelessness. Your Honor, in the record at the State's excerpts of record, pages 57 through 58, pages 112 through 114, and pages 171, both Mr. Toothman and Mr. Ellsworth opine that she was not a reliable or credible witness. She had been using drugs. She had disappeared and couldn't even be located at the time of Martinez's death. Only in her affidavit does she assert that she was in jail at the time. There was no – nothing to establish either way. And based upon her not being there during the attack, only showing up eight hours later, and all of this other information, they made a tactical decision not to call her because she wouldn't have been a reliable person. Your Honor, we – the State asks that this Court affirm the district court's denial of habeas relief in this case. Thank you. Thank you. Mr. Parnas, we added some time because we distracted you on our questions about conflicts, but, you know, you're free to cover whatever issues you wish. No, I appreciate it, Your Honor. The excerpt of the record that is 336 is the affidavit of Mary Poliso. It says, I went to Crystal Quillins to do my laundry. When I arrived there, I saw Cheryl in the bedroom. She did not have any bruises or cuts or appear to have been beaten in any way. She was not crying or asking for help and did not appear to be in fear of her safety or life. She could have left through the bedroom window or the back door if she had chosen to, as Sal was not in the area at the time I saw her. I left and returned about an hour later to change the laundry. I saw Sal and Cheryl sitting in the living room. Cheryl was smoking a cigarette, and I did not sense any tension between them. They were polite to each other, and Cheryl did not ask for any help or state that she had been raped. Cheryl did not ask for a ride from the trailer. I left once my laundry was done. I was not able to get a hold of her.  I did not know the name of the person who was at the scene of the incident. That evidence is critical evidence on the issue of consent. Yes, it happened after the alleged incidents or during the time of the alleged incidents because Rumpf contends that she was, you know, discontinued over a long period of time. That's contained in the affidavit. I wasn't allowed to call Cheryl Poliso. So the court rejected an evidentiary hearing on the basis of Poliso. Now, so her evidence, I think, is critical on the issue of consent. And it's an independent witness. The fact that she was involved in the legal system is certainly nothing unusual with any of these witnesses. But the fact that Rumpf was in the trailer is not disputed. She testified to that. Absolutely. But she contended that she didn't consent, wasn't happy, tried to, you know, was looking to escape and looked to escape, had bruises, all of these things that were alleged to have happened. She didn't go directly at that point to the police. It's not until later when that, you know, several hours later that there's even an allegation that's raised. Rumpf is on parole at the time, using drugs, concerned about what's going to happen to her. This is certainly evidence that should have been produced. Now, the state says that, well, there was a tactical reason not to call Mary Poliso. She wouldn't have been believed or so on. The lawyer did nothing in order to investigate, to follow up in an interview with her. We have the affidavit that she wasn't contacted. Two things dictate against the fact that this was a reasoned tactical decision. Number one, there was an attempt to subpoena Mary Poliso in April for the April trial that was vacated in March. And secondly, in the June trial, in opening statements, Mr. Toothman says, you're going to hear from Mary Poliso. But at the time, she wasn't under subpoena. They weren't doing anything to bring her into court. And so he tells the jury in opening statements, you're going to hear from this witness. It's going to be helpful to us. Doesn't appear. That's not a reasoned tactical decision. In fact, he probably said that, and there's no, you know, the record is unclear, but there's a lot of hostility between Mr. Toothman and Mr. Martinez by the time of trial. He's not talking to him. He's not listening to him. He doesn't meet with him about his testimony, Mr. Toothman. And he has this other junior attorney who just comes in and does the direct examination of Mr. Martinez, and that's it. So I don't think that there is the – I think we've shown that it's not a reasoned tactical decision about calling Mary Poliso. In regard to what's called character assassination, that's not the purpose of the evidence about the A1S court. The evidence about the A1S court is that Cheryl Rumpf was working as a prostitute that very night. There was – we were not able – the district court rejected our request to do DNA testing. There were antigens found on her – in her panties that did not – that were not hers and were not Mr. Martinez. The reason that we requested the DNA testing was to show that they were somebody else's, to support Mr. Martinez's argument that she was out not just being a prostitute in the past, but actively engaged in prostitution the very night that this was going on. And that evidence would have shown that. It wasn't character assassination. It's permitted under the Idaho Rape Victims Shield Law. This evidence would have been permitted. Yet early on, the attorney wrote a letter and said we're not going to test this material. There's no reason to test this forensic evidence. The only reason we ever test it is because we think that the government made a mistake. We're not going to test it, point blank. Well, that in and of itself is not a reasoned tactical decision not to test evidence when you've got confusion among – in the physical evidence. And this is the case. It's Mr. Martinez's word against Cheryl Rumpf's word. And also Krista Quillen. And if you add in what should have been Mary Polizzo, there is a reasonable probability of a different result in the conflicts between Mr. – Mr. Toothman and Mr. Martinez, whether they're caused because of what he knew about and whether they represented Cheryl – the office represented Rumpf and Quillen before, or whether it's because of a breakdown in the communications. This is not a breakdown in communications that creates a significant impediment. I don't know what is. Okay. We're over your time. Oh, I thought I had – okay. We added – Okay. I was on – We had several minutes already. Okay. So I – I appreciate it. Thank you. Thank you. Martinez v. Idaho shall be submitted. And we thank both counsels.
judges: Canby, Gould, Bea